WESLEY, Circuit Judge:
 

 This is the second time we have been asked to decide whether Jorge Yarur Bascuñán and affiliated parties (collectively, "Bascuñán") can sue his cousin Daniel Yarur Elsaca and affiliated parties (collectively, "Elsaca") under civil provisions of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO") for their role in an alleged network of transnational fraudulent schemes. The first time this case was before us, we reversed an order of the United States District Court for the Southern District of New York (Daniels,
 
 J.
 
 )
 
 [1]
 
 dismissing Bascuñán's claims as impermissibly extraterritorial. We remanded for the court to consider whether Bascuñán adequately pleaded a domestic injury in light of our opinion and any additional allegations in the then-pending Second Amended Complaint ("SAC").
 
 [2]
 
 On remand, the district court dismissed the SAC, finding that it failed to allege a domestic injury under RICO, impermissibly relied on extraterritorial applications of RICO predicate statutes, and failed to adequately allege a continuous pattern of racketeering activity.
 
 [3]
 
 For the following reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.
 

 *112
 

 BACKGROUND
 

 A. Factual Background
 

 [4]
 

 Bascuñán is a resident and citizen of Chile. His grandfather founded Banco de Crédito e Inversiones ("BCI"), the third-largest bank in Chile. His father was the president and controlling shareholder of the bank. In the 1990s, Bascuñán inherited a large fortune from his parents (the "Bascuñán Estate," or "Estate") consisting of numerous companies, financial property, a significant stake in BCI, and a large trust administered in New York. For reasons not relevant here, Bascuñán was unable to manage his fortune at the time his parents died.
 

 In 1999, Bascuñán hired Elsaca, his cousin, to manage the Bascuñán Estate. Elsaca is a citizen and resident of Chile and has a business degree from the London School of Economics. He is also a licensed accountant and prominent economist who formerly led the Superintendencia de Valores y Seguros (de Chile), which the SAC describes as Chile's equivalent of the U.S. Securities and Exchange Commission. Soon after Elsaca took the job, he and his attorney, Defendant José Pedro Silva Prado ("Silva"), persuaded Bascuñán to grant Elsaca power of attorney, giving him "complete control" over Bascuñán's finances. J.A. 615. Most notably, Elsaca gained the ability to transfer the Estate's property without obtaining Bascuñán's authorization.
 

 The bulk of the SAC focuses on four sets of alleged schemes to steal and misappropriate money from the Bascuñán Estate that Elsaca conducted individually, with associates, and through alter-ego shell corporations. In total, the SAC alleges that Elsaca stole at least $ 64 million.
 

 1. The New York Trust Account Scheme
 

 The New York Trust Account Scheme involved the misappropriation of assets held in two trusts owned by the Estate. J.P. Morgan set up the "Afghan Trust" in the Cayman Islands in 1998-before Bascuñán hired Elsaca-and has since administered it from New York, where the Afghan Trust's J.P. Morgan bank account is located. The Afghan Trust's stated purpose was funding Bascuñán's charitable endeavors. In 2001, Elsaca asked UBS to set up the "Capri Star Trust." Capri Star was also a Cayman Islands trust purportedly intended to support Bascuñán's charitable endeavors. Elsaca funded the Capri Star Trust with money from the Afghan Trust that he placed in a UBS bank account located and administered in New York.
 
 [5]
 
 The only members of the Capri Star Trust Committee were Elsaca and Silva.
 

 According to the SAC, the Capri Star Trust was a fraudulent enterprise, the "sole purpose" of which was "generat[ing] sham fees" for Elsaca and Silva.
 
 Id.
 
 at 617. Elsaca named himself "Investment Advisor" in Capri Star Trust documents and set his advisory fee at 1% per year of the assets under management. He withdrew his advisory fees by contacting UBS employees located in New York using the mail or wires and authorizing them to send money from Capri Star's New York bank
 
 *113
 
 account to Elsaca's own accounts. This conduct was fraudulent, the SAC alleges, because Elsaca "provided no investment advice to the Capri Star Trust, whose assets were actively managed by UBS."
 
 Id.
 
 at 618. In total, Elsaca ordered at least seventeen transfers, totaling more than $ 2.7 million, from the Capri Star Trust to accounts and entities under his control.
 

 Bascuñán also alleges that Elsaca used the Capri Star Trust Account to generate sham legal fees for Silva's law firm. Beginning in October 2001, Silva biannually mailed a $ 20,000 invoice for allegedly fictitious legal work to the Capri Star Trust. Elsaca then used the mail or wires to authorize UBS employees in New York to transfer money from Capri Star's New York bank account to Silva's firm. In 2005, Elsaca faxed a letter to UBS authorizing these biannual payments on a standing basis. Additionally, in 2001, Elsaca authorized a one-time wire transfer of $ 90,000 from Capri Star's New York bank account to Silva. In total, Elsaca sent Silva "at least $ 390,000."
 
 Id.
 
 at 621.
 

 2. The Anacapri Investment Fund Scheme
 

 The Anacapri Investment Fund Scheme involved four sub-schemes by which Elsaca and others allegedly stole over $ 60 million from the Bascuñán Estate. At the center of this activity was the ANACAPRI Private Investment Fund ("Anacapri"), created by Elsaca in 2003. Elsaca funded Anacapri with $ 48 million from three of Bascuñán's other companies.
 
 [6]
 

 i. The Fintair Misappropriation.
 

 Around June 2003, when the Estate owned Anacapri, Elsaca "caused Anacapri to acquire" Defendant-Appellee Fintair Finance Corp., a British Virgin Islands ("BVI") corporation that Elsaca owned and had formed earlier that year.
 
 Id.
 
 at 624. This acquisition made Fintair part of the Bascuñán Estate.
 
 [7]
 
 The SAC alleges that between 2003 and 2009, Elsaca falsely represented to Morgan Stanley that he, rather than the Bascuñán Estate, owned Fintair. Under this guise, Elsaca opened a New York-based Morgan Stanley bank account in Fintair's name and transferred $ 37,850,000 from the Bascuñán Estate into the account.
 
 [8]
 
 The transfers were directed through Defendant-Appellee GM & E Asset Management S.A. ("GM&E"), a Chilean corporation owned by Defendants-Appellees Cary Equity's Corp. and Hay's Finance Corp., which are themselves BVI corporations owned and controlled by Elsaca.
 
 [9]
 
 Elsaca then sent money from Fintair's New York bank account to himself and others in approximately 500 separate transfers and check deposits. Elsaca transferred around $ 30 million of these funds to the New York-based Morgan Stanley bank account of Defendant-Appellee Euweland Corp., a BVI corporation owned and controlled by Elsaca. Other transferees included Elsaca, Silva, Defendant-Appellee Cristían Jara Taito, Hay's, and
 
 *114
 
 GM&E, along with several nonparties affiliated with these individuals and entities.
 

 ii. The BCI Share Theft Scheme.
 

 The Bascuñán Estate owned 1.47% of BCI, the Chilean bank that Bascuñán's father had controlled prior to his death. The Estate held its interest via Plaintiff-Appellant Hofstra Corp., a BVI corporation that owned Plaintiff-Appellant Tarascona Corp., a BVI corporation that owned the shares. The SAC alleges that in 2007, when the shares were worth approximately $ 47 million, Elsaca or one of his agents traveled to New York to steal the physical bearer shares from Hofstra's safety deposit box. Elsaca subsequently registered the shares in the name of Nueva T Corp., a BVI corporation he had recently created. He then directed associates to issue shares of Nueva T to Euweland, another Elsaca-owned corporation. Two weeks later, Elsaca "caused the [Bascuñán] Estate to purchase" shares of Nueva T from Euweland using $ 43 million in Anacapri funds.
 
 Id.
 
 at 631. The allegation is effectively that Elsaca stole the shares from Bascuñán and then sold them back to him.
 

 iii. The Sham Anacapri Sale.
 

 Next, the SAC alleges that in 2009, Elsaca "misappropriated Anacapri," and thus its asset Fintair, which held Estate funds in its New York bank account.
 
 Id.
 
 at 634. It did this by "caus[ing Bascuñán's companies] to sell their stakes in Anacapri to [Defendant-Appellee Agrícola e Inmobiliaria Chauquén Limitada]," a Chilean corporation owned by Elsaca.
 
 Id.
 
 The sale was for roughly $ 7.5 million, but Anacapri's assets had a book value of around $ 21.5 million.
 
 [10]
 
 In effect, the allegation is that Elsaca "sold" Anacapri to his shell company at a $ 14 million discount.
 

 iv. The Sham Management Fees.
 

 Bascuñán also alleges that between 2000 and 2009, Elsaca paid himself approximately $ 16 million in sham management fees from Anacapri. Bascuñán claims Elsaca transferred this money from unknown accounts to several New York-based Morgan Stanley bank accounts owned by GM&E, a shell corporation that Elsaca indirectly owned.
 

 3. The Tarascona Misappropriation
 

 The SAC alleges that between 1999 and 2004, Elsaca opened and maintained eleven New York-based Morgan Stanley bank accounts in Tarascona's name for the purpose of misappropriating Estate funds. According to the SAC, Elsaca falsely represented to Morgan Stanley that he owned Tarascona, when in fact the Estate owned it. He then transferred Tarascona's money into the accounts of his own corporations. For example, he sent over $ 2 million in 333 transfers to the ten or more New York bank accounts belonging to Hay's.
 

 4. The BCI Dividend Misappropriation
 

 Finally, Bascuñán alleges that Elsaca and his associates misappropriated over $ 3.5 million in dividends earned on the BCI shares by diverting them to Estate-owned New York bank accounts, including the Fintair account, and then taking the funds.
 

 * * *
 

 Bascuñán alleges that he was unaware of Elsaca's schemes when they occurred and that Elsaca never provided him a true accounting of the Estate's assets. In late 2009, Bascuñán discovered that Elsaca had drafted Bascuñán's will in a manner that would have allowed Elsaca to control the Estate in perpetuity. Bascuñán soon severed ties with Elsaca. Over the following years, Bascuñán and various auditors uncovered Elsaca's alleged fraud. The SAC
 

 *115
 
 alleges that Bascuñán remains unaware of the full extent of the fraud because Elsaca and his associates have refused to cooperate with his investigations.
 
 [11]
 

 B. Litigation History
 

 Bascuñán filed this lawsuit in the United States District Court for the Southern District of New York and filed his First Amended Complaint ("FAC") shortly thereafter. Following an appeal and remand described below, Bascuñán filed the currently operative SAC.
 

 The SAC states five claims under federal and state law. Count 1 alleges that, through the above-described conduct, all Defendants violated
 
 18 U.S.C. § 1962
 
 (c), a substantive provision of RICO prohibiting individuals from conducting an enterprise through a pattern of racketeering activity. Seeking relief under
 
 18 U.S.C. § 1964
 
 (c), a private right of action commonly known as "civil RICO," Bascuñán alleges that all Defendants engaged in four categories of racketeering activity, or "predicates": (1) mail and wire fraud in violation of
 
 18 U.S.C. §§ 1341
 
 and 1343 ; (2) money laundering in violation of
 
 18 U.S.C. §§ 1956
 
 and 1957 ; (3) bank fraud in violation of
 
 18 U.S.C. § 1344
 
 ; and (4) violations of the Travel Act,
 
 18 U.S.C. § 1952
 
 . Count 2 alleges that all Defendants violated
 
 18 U.S.C. § 1962
 
 (d), another of RICO's substantive provisions, by knowingly conspiring to commit the same unlawful predicates. Count 3 is a state-law claim for unjust enrichment against all Defendants. Count 4 is a state-law constructive-trust claim against all Defendants. Count 5 asks the court to order Elsaca to provide an accounting of the full scope of his alleged misappropriation.
 

 Earlier in this litigation, the district court dismissed the FAC, which stated similar claims, under Rule 12(b)(6) of the Federal Rules of Civil Procedure.
 
 See
 

 Bascuñán
 
 , No. 15 Civ. 2009 (GBD),
 
 2016 WL 5475998
 
 , at *1. It principally found that the claims involved extraterritorial conduct that was beyond RICO's reach.
 

 Id.
 

 In
 
 RJR Nabisco, Inc. v. European Community
 
 , --- U.S. ----,
 
 136 S. Ct. 2090
 
 ,
 
 195 L.Ed.2d 476
 
 (2016), the Supreme Court held that RICO's private right of action, contained in § 1964, does not overcome the presumption against extraterritoriality, and therefore in order to state a claim under the statute, a plaintiff must allege a domestic injury. Interpreting that decision, the district court held that Bascuñán had failed to allege a domestic injury as required by § 1964 because he "resided" in Chile when he sustained the "injury" in question.
 
 Bascuñán
 
 , No. 15 Civ. 2009 (GBD),
 
 2016 WL 5475998
 
 , at *5-6. The court also denied Bascuñán's motion for leave to file the then-pending SAC.
 

 Id.
 

 at *6 n.16.
 

 We reversed in
 
 Bascuñán I
 
 . Rejecting the district court's residency test, we held that "when a foreign plaintiff [alleging a civil RICO injury] maintains tangible property in the United States, the misappropriation of that property constitutes a domestic injury."
 
 Bascuñán I
 
 , 874 F.3d at 814. Applying our rule to the versions of the BCI Dividend and Anacapri Investment Fund schemes stated in the FAC, we found no domestic injury because the only domestic aspect of these allegations was that Elsaca transferred stolen funds
 
 into
 
 domestic bank accounts.
 
 Id.
 
 at 818. However, we held that the New York Trust Account and BCI Share Theft schemes involved domestic injuries because those allegations concerned property that was taken
 
 *116
 

 out of
 
 bank accounts physically located in the United States.
 
 Id.
 
 We accordingly reversed the district court's judgment dismissing the FAC, vacated its order denying Bascuñán's motion for leave to file his SAC, and remanded for further proceedings.
 
 Id.
 
 at 825.
 

 On remand, Bascuñán filed the SAC. He contends that he had not known at the time of filing the FAC that "[the] defendants opened and maintained approximately 31 accounts at Morgan Stanley in New York between 1999 and at least 2012." District Court Docket, ECF No. 65 at 4. Unlike the FAC, the SAC contains the above-described allegations that, with respect to the BCI Dividend Misappropriation and Anacapri Investment Fund schemes, the Defendants perpetrated their fraud by repeatedly stealing money
 
 out of
 
 the Estate's Morgan Stanley bank accounts
 
 in New York
 
 . Additionally, the SAC contained new allegations that Fintair (and, thus, its New York bank account) was part of the Estate between 2003 and 2009, a fact Bascuñán had not previously known and that Elsaca conceded in a 2016 declaration.
 
 See
 
 J.A. 240-41.
 

 Elsaca again moved to dismiss under Rule 12(b)(6). As relevant here, he argued (1) that Bascuñán failed to allege a domestic injury with respect to much of Elsaca's conduct, (2) that although the New York Trust Account Scheme involved a domestic RICO injury, the claim relied on impermissibly extraterritorial applications of the RICO predicate statutes, and (3) that whichever schemes survived an extraterritoriality analysis did not amount to a continuous pattern of racketeering activity as required under RICO.
 
 See
 

 Yarur Bascuñán
 
 , 338 F. Supp. 3d at 306-07. The district court agreed on all three grounds, declined to exercise supplemental jurisdiction over the state-law claims, and dismissed the SAC in its entirety.
 
 See
 

 id.
 
 at 307, 316-17. Bascuñán timely appealed.
 

 DISCUSSION
 

 This appeal brings us to the intersection of civil RICO and the presumption against extraterritoriality, a prescriptive comity doctrine and canon of statutory construction that limits the reach of federal statutes to domestic conduct unless they purport to apply to extraterritorial conduct.
 
 See
 

 In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC
 
 ,
 
 917 F.3d 85
 
 , 95 (2d Cir. 2019). As the Supreme Court explained in
 
 RJR Nabisco
 
 , "[t]he question of RICO's extraterritorial application really involves two questions. First, do RICO's substantive prohibitions, contained in § 1962, apply to conduct that occurs in foreign countries? Second, does RICO's private right of action, contained in § 1964(c), apply to injuries that are suffered in foreign countries?"
 
 136 S. Ct. at 2099
 
 .
 

 To resolve this appeal, we must decide (1) whether the conduct violating the predicate statutes was extraterritorial, (2) whether the application of civil RICO to Bascuñán's alleged injuries (
 
 i.e.
 
 , the fraudulent schemes) is extraterritorial, and (3) whether the surviving schemes amount to a pattern of racketeering activity. The district court faulted different aspects of the SAC on all three issues. We begin, as did the parties and the district court, with the second issue.
 

 I. All but One of Bascuñán's Injuries Are Domestic Under § 1964(c).
 

 We review
 
 de novo
 
 a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff.
 
 Caro v. Weintraub
 
 ,
 
 618 F.3d 94
 
 , 97 (2d Cir. 2010).
 

 *117
 
 The Supreme Court has directed us to employ a "two-step framework" where, as here, a case implicates extraterritoriality issues. "At the first step, we ask whether the presumption against extraterritoriality has been rebutted-that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. ... If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute."
 
 RJR Nabisco
 
 ,
 
 136 S. Ct. at 2101
 
 .
 

 The Supreme Court has already held that civil RICO does not rebut the presumption against extraterritoriality.
 

 Id.
 

 at 2111
 
 . Therefore, "[t]he ... question on appeal subject to our
 
 de novo
 
 review ... is whether Bascuñán plausibly alleged a domestic injury to business or property."
 
 Bascuñán I
 
 , 874 F.3d at 814. Whether an injury is domestic "will, as a general matter, depend on the particular facts alleged in each case."
 
 Id.
 
 at 817-18. Absent extraordinary circumstances, "when a foreign plaintiff maintains tangible property in the United States, the misappropriation of that property constitutes a domestic injury."
 
 Id.
 
 at 814 ;
 
 see
 

 id.
 
 at 820.
 

 In
 
 Bascuñán I
 
 , we held based on the allegations in the FAC that the BCI Share Theft and New York Trust Account schemes involved domestic injuries because they "allege[d] that certain property-although belonging to a foreign owner-was located within the United States when it was stolen."
 
 Id.
 
 at 820. We found that the BCI Share Theft injury occurred in New York because Bascuñán claimed that Elsaca stole physical bearer shares from a New York safety deposit box.
 
 See
 

 id.
 
 at 824. The New York Trust Account Scheme involved financial, rather than tangible, property.
 
 Id.
 
 at 822. But we rejected any distinction between these categories, finding that the misappropriation of funds held in a bank account is "analogous to an injury to tangible property ... [meaning] property that can be fairly said to exist in a precise location."
 
 Id.
 
 at 820. Because the bank accounts were located
 
 inside
 
 the United States, the alleged theft of funds deposited in those accounts was domestic conduct.
 
 Id.
 
 at 823.
 

 By contrast, the remaining schemes concerned property that was located
 
 outside
 
 the United States when it was allegedly misappropriated. We affirmed the court's finding that those schemes were impermissibly extraterritorial as pleaded in the FAC, emphasizing that "the use of bank accounts located within the United States to facilitate or conceal the theft of property located outside of the United States does not, on its own, establish a domestic injury."
 
 See
 

 id.
 
 at 819.
 
 [12]
 

 As Elsaca has not argued to the contrary in either the district court or this Court, we find that the New York Trust Account and BCI Share Theft schemes as pleaded in the SAC continue to allege domestic conduct.
 
 See, e.g.
 
 ,
 
 Yarur Bascuñán
 
 , 338 F. Supp. 3d at 314 ("Defendants concede that the alleged misappropriation of funds from the Afghan Trust in New York for the purpose of generating sham fees satisfies RICO's domestic injury requirement."). Because
 
 Bascuñán I
 
 held that most of the remaining injuries were extraterritorial as alleged in the FAC, the key question here is whether the SAC's newly pleaded allegations assert the necessary domestic nexus.
 

 A. The Fintair Misappropriation Involved a Domestic Injury.
 

 The crux of the Fintair allegation is that Elsaca caused Anacapri to acquire Fintair,
 
 *118
 
 opened a New York-based Morgan Stanley bank account in Fintair's name, filled the account with money from the Estate's presumably foreign accounts, and then sent this money from the New York bank account to himself and others in roughly 500 transfers. Unlike the SAC, the FAC at issue in
 
 Bascuñán I
 
 did not allege that the Bascuñán Estate owned Fintair or that Elsaca transferred Bascuñán's money out of a domestic bank account.
 

 Both sides agree that Bascuñán's injuries occurred at the times of the alleged thefts or misappropriations. The dispute is over
 
 when
 
 the theft or misappropriation occurred and, transitively,
 
 where
 
 the funds were located when Elsaca stole them. Elsaca maintains that any theft or misappropriation occurred when Elsaca moved Estate funds from Bascuñán's foreign bank accounts into Bascuñán's New York Fintair account. Thus, he concludes, Bascuñán's injury took place abroad. Bascuñán argues that this initial transfer to Fintair was simply a transfer from one Estate account to another because the Estate owned Fintair and its New York bank account. On that basis, he concludes that the theft and misappropriation occurred when Elsaca subsequently made the roughly 500 transfers from Fintair's New York bank account, as only then did the money leave the Estate. Under this theory, the injury occurred in the United States.
 

 We agree with Bascuñán. The Estate owned Fintair when Elsaca transferred money into and out of its New York bank account, a fact Elsaca conceded in a declaration he submitted to the district court.
 
 See
 
 J.A. 240-41 (stating that from 2003 through 2009, "Fintair was owned by [Bascuñán]"). Thus, Elsaca's transfers of the Estate's money into Fintair's New York bank account were simply transfers from one Bascuñán account to another, made by an individual who had the colorable authority to order these transfers under his broad power of attorney. The alleged theft or misappropriation occurred when the funds left the Estate, at which time they were located in a Morgan Stanley bank account in New York.
 

 Adopting Elsaca's theory would effectively require us to conclude that the Bascuñán Estate stole money from itself. Although Bascuñán was unaware that Elsaca had opened the Fintair account and filled it with the Estate's money, Bascuñán nonetheless owned the account through his ownership of Fintair. The SAC supports a reasonable inference that he could have accessed the funds at any time had he known about the account.
 
 [13]
 
 It is possible that Elsaca violated some fiduciary duty by transferring funds from foreign Estate accounts into the New York Fintair account.
 
 [14]
 
 But the SAC leaves little doubt that the injury Bascuñán pleads is that Elsaca stole the Estate's money, not that he improperly moved it.
 
 [15]
 

 *119
 
 Our conclusion that Bascuñán adequately pleaded a domestic injury is reinforced by our jurisprudence surrounding fraud offenses, and particularly the law of embezzlement, which the Supreme Court has described as the "linguistic neighbor" of fraud.
 
 See
 

 Bullock v. BankChampaign, N.A.
 
 ,
 
 569 U.S. 267
 
 , 274,
 
 133 S.Ct. 1754
 
 ,
 
 185 L.Ed.2d 922
 
 (2013). An individual traditionally commits embezzlement "when he: (1) with intent to defraud; (2) converts to his own use; (3) property belonging to another, in a situation where (4) the property initially lawfully came within his possession or control."
 
 United States v. Sampson
 
 ,
 
 898 F.3d 270
 
 , 277 (2d Cir. 2018). The crime of embezzlement therefore "builds on the concept of conversion," which "involves an act of control or dominion over the property that seriously interferes with the owner's rights."
 
 United States v. Stockton
 
 ,
 
 788 F.2d 210
 
 , 216 (4th Cir. 1986) ;
 
 see also
 

 Bullock
 
 ,
 
 569 U.S. at 274
 
 ,
 
 133 S.Ct. 1754
 
 ("[A]s commonly used, 'embezzlement' requires conversion."). And as the Fourth Circuit has noted, "[t]here can, of course, be no interference with the owner's rights to the property if the owner has given permission to the act in question."
 

 Id.
 

 Elsaca conceded at oral argument that, until he transferred the funds from Estate accounts to his own personal accounts, he was acting lawfully pursuant to his broad power of attorney,
 
 i.e.
 
 , the permission granted to him by Bascuñán. Moreover, according to the SAC, until Elsaca transferred those funds, Bascuñán could have accessed the Estate accounts in New York. Thus, it follows that Bascuñán was not injured until Elsaca interfered with Estate property and converted it to his own use
 
 in the United States
 
 . This conclusion accords with our decision in
 
 McCarthy
 
 , where we held that a certified public accountant completed the crime of embezzlement when he, without authorization, transferred funds
 
 from trust accounts into personal accounts that he controlled
 
 .
 
 United States v. McCarthy
 
 ,
 
 271 F.3d 387
 
 , 395 (2d Cir. 2001).
 

 Once we recognize that Bascuñán's injuries occurred when Elsaca transferred money out of the New York Fintair account, the Fintair Misappropriation Scheme looks almost exactly like the New York Trust Account Scheme. For each of them, Bascuñán alleges that Elsaca stole money from a New York bank account belonging to the Estate.
 
 See
 

 Bascuñán I
 
 , 874 F.3d at 820. Moreover,
 
 Bascuñán I
 
 noted that "[f]oreign persons and entities that own private property located within the United States expect that our laws will protect them in the event of damage to that property. That modest expectation is entirely justified, especially when we consider that a foreign resident's property located in the United States is otherwise subject to all of the regulations imposed on private property by American state and federal law."
 
 Id.
 
 at 821. In assessing the New York Trust Account Scheme,
 
 Bascuñán I
 
 held that this allegation states a domestic injury-the theft of property located inside the United States.
 
 See
 

 id.
 
 at 823. The same conclusion applies here.
 

 B. The Tarascona Misappropriation Involved a Domestic Injury.
 

 This logic also applies to the Tarascona Misappropriation. The SAC alleges that Elsaca opened eleven New York bank accounts
 
 *120
 
 in Tarascona's name, filled them with money from the Estate's foreign accounts, and over time transferred the money out of the Estate. It also alleges that the Estate owned Tarascona and its bank accounts. Thus, the transfers to Tarascona's New York accounts were intra-Estate transfers, and the theft occurred when Elsaca transferred the money out of, not into, those accounts. These are domestic injuries.
 

 C. The Sham Anacapri Sale Involved a Domestic Injury.
 

 The Sham Anacapri Sale allegation is that Elsaca caused Bascuñán's companies to sell their stakes in Anacapri-at one third of their book value-to a Chilean corporation owned by Elsaca. Bascuñán claims that this fraudulent sale constituted a domestic injury because Anacapri owned Fintair, Fintair's assets were held in a New York bank account, and the unlawful sale thus involved the theft or misappropriation of property located in the United States. We agree to the extent that Bascuñán alleges a misappropriation through the sale of Fintair.
 
 [16]
 

 D. The BCI Dividend Misappropriation Involved a Domestic Injury.
 

 The BCI Dividend Misappropriation allegation is that Elsaca stole dividends earned on the BCI shares by diverting them to the Fintair account and then withdrawing them for personal use. For the reasons stated above, the injuries occurred when Elsaca stole money from a New York bank account. Again, the Estate's New York accounts did not merely facilitate the fraud but were instead the targets of the fraud. These injuries thus satisfy RICO's domestic-injury requirement to the extent Bascuñán alleges that the dividends were diverted to Fintair's New York account and then misappropriated through the sale of Fintair.
 

 E. As Alleged, the Sham Management Fees Scheme Did Not Involve a Domestic Injury.
 

 Bascuñán concedes that he does not know where the injuries caused by the Sham Management Fees Scheme took place because he does not know the locations of the accounts from which Elsaca withdrew the relevant funds. He asks that we remand on this issue to allow discovery on the locations of the accounts. Because the SAC does not allege that these injuries took place in the United States, the district court correctly held that this scheme is impermissibly extraterritorial as pleaded. However, should Bascuñán learn additional facts during discovery indicating that these injuries were domestic, the court in its discretion may allow him to allege these facts in an amended complaint.
 

 * * *
 

 In sum, each of the injuries alleged in the SAC, except for the Sham Management Fees Scheme, calls for a domestic application of civil RICO.
 

 II. The Mail, Wire, and Bank Fraud Statutes Focus on Domestic Conduct as Applied to the Remaining Alleged Schemes to Defraud.
 

 The next issue is whether the civil RICO claims involve domestic applications of the relevant predicate statutes.
 
 RJR Nabisco
 
 ,
 
 136 S. Ct. at 2101
 
 . The predicates and their corresponding statutes are: (1) mail and wire fraud,
 
 18 U.S.C. §§ 1341
 
 and
 
 *121
 
 1343 ; (2) money laundering,
 

 id.
 

 §§ 1956 and 1957; (3) bank fraud,
 

 id.
 

 § 1344; and (4) violations of the Travel Act,
 

 id.
 

 § 1952.
 

 A. The Mail and Wire Fraud Statutes Regulate Domestic Conduct as Applied to the Alleged Schemes to Defraud.
 

 As outlined above, extraterritoriality concerns give way when "either the statute indicates its extraterritorial reach or the case involves a domestic application of the statute."
 
 In re Picard
 
 ,
 
 917 F.3d at 95
 
 . The mail and wire fraud statutes do not indicate an extraterritorial reach.
 
 See
 

 European Cmty. v. RJR Nabisco, Inc.
 
 ,
 
 764 F.3d 129
 
 , 141 (2d Cir. 2014),
 
 rev'd on other grounds
 
 , --- U.S. ----,
 
 136 S. Ct. 2090
 
 ,
 
 195 L.Ed.2d 476
 
 (2016). Thus, Bascuñán can employ them only if they apply to domestic conduct on these facts. We therefore must determine whether the conduct relevant to their "focus" occurred in the United States.
 
 See
 

 In re Picard
 
 ,
 
 917 F.3d at 96
 
 (quoting
 
 RJR Nabisco
 
 ,
 
 136 S. Ct. at
 
 2101 ). "The focus of a statute is the conduct it seeks to regulate, as well as the parties whose interests it seeks to protect."
 
 Id.
 
 at 97.
 

 1. The Mail and Wire Fraud Statutes Focus on Domestic Conduct when the Use of Domestic Mail or Wires Was a Core Component of the Scheme to Defraud.
 

 The mail and wire fraud statutes, whose labyrinthine language is better taken abridged, "criminalize the use of the mails or wires in furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.' "
 
 Skilling v. United States
 
 ,
 
 561 U.S. 358
 
 , 369 n.1,
 
 130 S.Ct. 2896
 
 ,
 
 177 L.Ed.2d 619
 
 (2010) (quoting
 
 18 U.S.C. § 1341
 
 (mail fraud);
 

 id.
 

 § 1343 (wire fraud)). "Because the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way."
 
 United States v. Weaver
 
 ,
 
 860 F.3d 90
 
 , 94 (2d Cir. 2017) (citation omitted).
 

 The "focus" of these statutes for the purpose of the presumption against extraterritoriality is a question of first impression in our circuit.
 
 See
 

 European Cmty.
 
 ,
 
 764 F.3d at
 
 142-43 & n.14. The district court, relying on other district court opinions, concluded that both statutes focus on the "scheme to defraud," which must have been "planned, managed, and directed" from within the United States.
 
 Yarur Bascuñán
 
 , 338 F. Supp. 3d at 314-15. Elsaca agrees. The courts in this circuit are not of one mind on the focus of these statutes.
 
 [17]
 
 It will come as no surprise that Bascuñán proposes several alternative theories drawn from other lower court opinions within the circuit.
 

 Because the focus of a statute includes the conduct it seeks to regulate,
 
 see
 

 *122
 

 In re Picard
 
 ,
 
 917 F.3d at 97
 
 , our analysis begins by identifying that conduct. There are three "essential elements" to mail or wire fraud: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3)
 
 use of the mails or wires to further the scheme
 
 ."
 
 Weaver
 
 ,
 
 860 F.3d at 94
 
 (citation omitted, emphasis added). These elements make clear that the regulated conduct is not merely a "scheme to defraud," but more precisely
 
 the use of the mail or wires in furtherance of a scheme to defraud
 
 .
 

 At least three of our sister circuits, though not in the context of applying the presumption against extraterritoriality, have described the focus of these statutes in substantially identical terms.
 
 [18]
 
 The Supreme Court has done the same for over a century.
 
 [19]
 

 While this principle guides our approach to the domestic-conduct question, we are mindful that "events ... merely incidental to the [violation of a statute]" do not have "primacy for the purposes of the extraterritoriality analysis."
 
 WesternGeco LLC v. ION Geophysical Corp.
 
 , --- U.S. ----,
 
 138 S. Ct. 2129
 
 , 2138,
 
 201 L.Ed.2d 584
 
 (2018) ;
 
 see also
 

 Morrison v. Nat'l Austl. Bank Ltd.
 
 ,
 
 561 U.S. 247
 
 , 266,
 
 130 S.Ct. 2869
 
 ,
 
 177 L.Ed.2d 535
 
 (2010) ("[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever
 
 some
 
 domestic activity is involved in the case."). For this reason, the use of the mail or wires must be essential, rather than merely incidental, to the scheme to defraud.
 

 We therefore hold that a claim predicated on mail or wire fraud involves sufficient domestic conduct when (1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of the mail or wires was a core component of the scheme to defraud.
 
 [20]
 

 *123
 
 The district court's rule would effectively immunize offshore fraudsters from mail or wire fraud. That outcome is inconsistent with
 
 European Community
 
 ,
 
 764 F.3d 129
 
 . There, we concluded that RICO plaintiffs stated claims for domestic mail and wire fraud by alleging, among other things, "that the Defendants managed their global money laundering schemes from the United States through foreign ... communications," and "that the schemes themselves were directed at the United States and had substantial domestic effects."
 

 Id.
 

 at 141
 
 .
 
 [21]
 
 We make clear today what
 
 European Community
 
 implied: while a defendant's location is relevant to whether the regulated conduct was domestic, the mail and wire fraud statutes do not give way simply because the alleged fraudster was located outside the United States.
 

 2. The Use of the Mail or Wires Furthered the Alleged Schemes to Defraud.
 

 The district court and the parties focused their analyses of this issue almost exclusively on the New York Trust Account Scheme.
 

 The SAC alleges that the New York Trust Account Scheme involved two types of fraud: Elsaca transferring sham advisory fees to himself, and Elsaca transferring sham legal fees to Silva. The essence of both allegations is that Elsaca created the bogus Capri Star Trust, funded its New York bank account with money from the Afghan Trust, and then used domestic mail and wires to order UBS-located in New York-to transfer millions of dollars from that account to himself and Silva.
 
 [22]
 
 The SAC supports a reasonable inference that the repeated use of domestic mail and wires to fraudulently order a domestic bank to transfer millions of dollars out of a domestic account was a core component of the alleged scheme to defraud.
 
 [23]
 

 The same reasoning applies to the remaining schemes. A core component of each allegation is that Elsaca repeatedly used domestic mail or wires to order a New York bank to fraudulently transfer money out of a New York bank account.
 

 Accordingly, for each of the schemes to defraud alleged in the SAC, the mail and wire fraud statutes focus on domestic conduct.
 
 [24]
 

 B. The Bank Fraud Statute Regulates Domestic Conduct as Applied to the Alleged Schemes to Defraud.
 

 The bank fraud statute states:
 

 Whoever knowingly executes, or attempts to execute, a scheme or artifice-
 
 *124
 
 (1) to defraud a financial institution; or
 

 (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
 

 shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both.
 

 18 U.S.C. § 1344
 
 . The bank fraud statute does not purport to apply to extraterritorial conduct. "When a statute gives no clear indication of an extraterritorial application, it has none."
 
 Morrison
 
 , 561 U.S. at 255,
 
 130 S.Ct. 2869
 
 . We therefore return to the domestic-conduct prong of the extraterritoriality framework.
 

 1. Section 1344(2) of the Bank Fraud Statute Focuses on a Scheme to Obtain Property Owned or Controlled by a Bank Under False or Fraudulent Pretenses.
 

 As the text of the bank fraud statute makes clear, the conduct it proscribes is knowingly executing a scheme to (1) defraud a financial institution or (2) fraudulently obtain assets owned by or under the custody of a financial institution.
 
 See
 

 18 U.S.C. § 1344
 
 . We construe the SAC to rely on the second category.
 

 As the Supreme Court has explained, " § 1344(2) requires that a defendant 'knowingly execute, or attempt to execute, a scheme or artifice' with at least two elements": (1) that the defendant intended to obtain property owned or controlled by a bank, and (2) that the envisioned result would have occurred, or did occur, by false pretenses, representations, or promises.
 
 Loughrin v. United States
 
 ,
 
 573 U.S. 351
 
 , 355,
 
 134 S.Ct. 2384
 
 ,
 
 189 L.Ed.2d 411
 
 (2014) (quoting
 
 18 U.S.C. § 1344
 
 ) (brackets omitted).
 
 [25]
 
 Thus, the conduct that § 1344(2) seeks to regulate, and its focus, is a scheme to obtain property owned or controlled by a bank under false or fraudulent pretenses. Though we do not foreclose other possibilities, this conduct is domestic when a core component of the scheme to defraud was the use of domestic mail or wires to direct the theft or misappropriation of property located within the United States and held by a domestic bank.
 

 2. The Schemes to Obtain Property Controlled by New York Banks Involved Domestic Conduct.
 

 As previously noted, the crux of the New York Trust Account Scheme is that Elsaca ordered New York banks to transfer the Estate's property out of its New York bank accounts and into accounts belonging to Elsaca and Silva. The SAC alleges these transfers were for "sham fees" because Elsaca and Silva did not perform the invoiced advisory and legal services.
 

 The SAC clearly alleges the New York Trust Account Scheme was "a scheme ... to obtain any of the moneys ... under the custody or control of, a [domestic] financial institution, by means of false or fraudulent pretenses, representations, or promises."
 
 See
 

 18 U.S.C. § 1344
 
 (2). For the reasons stated in our analysis of the mail and wire fraud statutes, a core component of this scheme was Elsaca ordering UBS via the mail and wires to transfer money out of the Estate's New York bank account. Thus, the New York Trust Account
 
 *125
 
 Scheme calls for a domestic application of the bank fraud statute.
 

 The other alleged schemes involve the same domestic conduct-domestic mail or wire transmissions facilitating the theft or misappropriation of property held in New York by a domestic bank. We accordingly find that § 1344(2) focuses on domestic conduct as applied to each of the alleged schemes to defraud.
 

 III. The Surviving Schemes State a Pattern of Racketeering Activity.
 

 After holding that every scheme was impermissibly extraterritorial except the BCI Share Theft Scheme, the district court found that Bascuñán failed to allege a pattern of racketeering activity with respect to that one scheme. As the court explained, a pattern of racketeering activity requires at least two related unlawful acts.
 
 See, e.g.
 
 ,
 
 Cofacredit, S.A. v. Windsor Plumbing Supply Co.
 
 ,
 
 187 F.3d 229
 
 , 242 (2d Cir. 1999) (citing
 
 18 U.S.C. § 1961
 
 (5) ). The court concluded that this single scheme did not suffice. It did not explain how it would have decided the pattern issue had it also weighed the schemes it found impermissibly extraterritorial.
 

 As noted above, we find that all of the SAC's alleged schemes, except for the Sham Management Fees Scheme, survive the extraterritoriality framework. Although our ordinary practice would be to remand for the district court to reconsider whether Bascuñán has adequately alleged a pattern of racketeering activity, Elsaca makes no argument in his brief that the numerous schemes, taken together, fail to satisfy this standard; he focuses solely on the BCI Share Theft Scheme. We therefore find that Elsaca has waived any argument to the contrary, and we accordingly hold that the surviving schemes as pleaded in the SAC state a pattern of racketeering activity sufficient to survive a motion to dismiss under Rule 12(b)(6).
 
 [26]
 

 IV. Additional Claims
 

 This opinion has thus far focused on Count 1, which alleges a violation of § 1962(c) of RICO. Count 2 alleges a violation of RICO § 1962(d), which proscribes conspiracies to violate § 1962(c). Because the SAC states a claim under § 1962(c), and the claim involves several individuals conspiring to violate that provision, the § 1962(d) claim is not impermissibly extraterritorial.
 

 Counts 3-5 are state-law claims. Without addressing their merits, the district court declined to exercise supplemental jurisdiction over these claims upon dismissing Bascuñán's RICO claims. Because we hold that the RICO claims survive, we vacate the district court's dismissal of the state-law claims. On remand, the court should reconsider whether it will exercise supplemental jurisdiction over these claims in light of our reinstatement of the RICO claims. However, because Elsaca does not argue that the state-law claims are legally insufficient under Rule 12(b)(6),
 
 [27]
 
 we hold
 
 *126
 
 that he has waived any argument to that effect.
 
 [28]
 

 CONCLUSION
 

 For the foregoing reasons, we hold that each of the schemes to defraud, except for the Sham Management Fees Scheme, calls for domestic applications of
 
 18 U.S.C. §§ 1962
 
 (c), 1962(d), 1341, 1343, and 1344(2). We also hold that the district court abused its discretion by dismissing the state-law claims for lack of supplemental jurisdiction. We accordingly
 
 REVERSE
 
 the district court's judgment dismissing the SAC and
 
 REMAND
 
 for further proceedings consistent with this opinion. On remand, the court should direct Elsaca to expeditiously file an answer to the SAC so that the action may proceed to discovery.
 

 [1]
 

 See
 

 Bascuñán v. Elsaca
 
 , No. 15 Civ. 2009 (GBD),
 
 2016 WL 5475998
 
 (S.D.N.Y. Sept. 28, 2016).
 

 [2]
 

 See
 

 Bascuñán v. Elsaca
 
 (
 
 Bascuñán I
 
 ),
 
 874 F.3d 806
 
 (2d Cir. 2017).
 

 [3]
 

 See
 

 Yarur Bascuñán v. Yarur Elsaca
 
 ,
 
 338 F. Supp. 3d 301
 
 (S.D.N.Y. 2018).
 

 [4]
 

 As this appeal arises from a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, we assume the allegations in the SAC to be true.
 
 See, e.g.
 
 ,
 
 Bascuñán I
 
 ,
 
 874 F.3d at 810
 
 .
 

 [5]
 

 This critical allegation, along with the below-described allegation that Elsaca authorized transfers out of this account by contacting UBS employees in New York via the mail and wires, was missing from the First Amended Complaint ("FAC") for reasons noted below.
 

 [6]
 

 Those companies are Plaintiffs-Appellants Inmobiliaria Milano S.A., Inmobiliaria e Inversiones Tauro S.A., and Inversiones T & V S.A.
 

 [7]
 

 This critical allegation was missing from the FAC for reasons noted below.
 

 [8]
 

 As the district court noted, the SAC does not indicate where the funds were located before Elsaca transferred them to Fintair.
 

 [9]
 

 Defendant-Appellee Cristían Jara Taito, a Chilean citizen, participated in the Fintair scheme in his capacity as GM&E's general manager. Defendant-Appellee Oscar Bretón Dieguez, also a Chilean citizen, participated in his capacity as a member of Anacapri's oversight committee.
 

 [10]
 

 Bascuñán is uncertain of Anacapri's actual value at the time.
 

 [11]
 

 The SAC alleges that Chilean authorities prosecuted Elsaca for misappropriation in relation to some of the above-described conduct. A divided court acquitted him but found his conduct "constituted a non-compliance of civil obligations."
 
 Id.
 
 at 652.
 

 [12]
 

 Bascuñán I
 
 did not address the Tarascona Misappropriation Scheme because it was not pleaded in the FAC.
 
 See
 

 id.
 
 at 819 n.53.
 

 [13]
 

 Indeed, the SAC suggests that Elsaca's decision to initially move the $ 37,850,000 of Estate funds into the Fintair account was an integral part of the scheme. The allegation is not that Elsaca stole the money all at once, but that he slowly siphoned it from Fintair into a network of shell corporations in more than 500 separate transfers taking place over many years.
 

 [14]
 

 Elsaca's argument for affirmance on this theory is conclusory and provides no persuasive basis for us to find that any fiduciary violation amounted to the theft or misappropriation alleged in the SAC. For this reason, and because we affirmatively conclude that the theft and misappropriation occurred when Elsaca transferred funds out of the Fintair account, we express no opinion on whether Elsaca's transfers from one Estate account to another were unlawful.
 

 [15]
 

 For similar reasons, we disagree with the district court's view that "the SAC alleges [at most] that banks located in New York were used to facilitate or conceal the theft of property taken from outside the United States."
 
 Yarur Bascuñán
 
 ,
 
 338 F. Supp. 3d at 313
 
 (emphasis omitted). The money left the Estate when Elsaca transferred it out of Fintair's New York bank account and into his own accounts. This is a misappropriation of property located inside the United States, not the mere use of a domestic account to facilitate or conceal a misappropriation that had previously occurred.
 

 [16]
 

 In his brief, Elsaca does not argue that the assets Fintair held in New York constituted only a small percentage of Anacapri's total assets at the time of the Anacapri sale. Thus, we are not asked to determine the location of Bascuñán's injury based on the distribution of Anacapri's assets abroad.
 

 [17]
 

 See, e.g.
 
 ,
 
 United States v. Gasperini
 
 , No. 16 Crim. 441 (NGG),
 
 2017 WL 2399693
 
 , at *8 (E.D.N.Y. June 1, 2017) ("[A] complaint alleges a domestic application of wire fraud when (1) a defendant or coconspirator commits a substantial amount of conduct in the United States, (2) the conduct is integral to the commission of the scheme to defraud, and (3) at least some of the conduct involves the use of U.S. wires in furtherance of the scheme to defraud." (citation omitted));
 
 United States v. Hawit
 
 , No. 15 Crim. 252 (PKC),
 
 2017 WL 663542
 
 , at *5 (E.D.N.Y. Feb. 17, 2017) ("[I]n a given case, a court must conduct a more holistic assessment of the conduct that constitutes the alleged fraud scheme, including consideration of whether the scheme involves only incidental or minimal use of U.S. wires.");
 
 Reich v. Lopez
 
 ,
 
 38 F. Supp. 3d 436
 
 , 448 (S.D.N.Y. 2014) ("As long as enough domestic conduct exists to fulfill the requirements of ... wire fraud, it is irrelevant that those statutes are further violated by conduct that is extraterritorial in nature."),
 
 aff'd
 
 ,
 
 858 F.3d 55
 
 (2d Cir. 2017).
 

 [18]
 

 See, e.g.
 
 ,
 
 United States v. Garlick
 
 ,
 
 240 F.3d 789
 
 , 792 (9th Cir. 2001) ("The focus of the mail and wire fraud statutes is upon the misuse of the instrumentality of communication." (brackets omitted) (quoting
 
 United States v. Alston
 
 ,
 
 609 F.2d 531
 
 , 536 (D.C. Cir. 1979) ));
 
 United States v. Jefferson
 
 ,
 
 674 F.3d 332
 
 , 366 (4th Cir. 2012) ("In a mail or wire fraud prosecution, the mailing or wire transmission itself-i.e., misuse of the mail or wire-has consistently been viewed as the
 
 actus reus
 
 that is punishable by federal law."). Although it did so in an unpublished decision under plain-error review, the Ninth Circuit has held in the context of applying the presumption against extraterritoriality that the conduct the wire fraud statute seeks to regulate is not "the scheme to defraud," but "the misuse of the instrumentality of communication."
 
 United States v. Driver
 
 ,
 
 692 F. App'x 448
 
 , 449 (9th Cir. 2017) (summary order),
 
 cert. denied
 
 , --- U.S. ----,
 
 138 S. Ct. 1304
 
 ,
 
 200 L.Ed.2d 487
 
 (2018).
 

 [19]
 

 See, e.g.
 
 ,
 
 Skilling
 
 , 561 U.S. at 369 n.1,
 
 130 S.Ct. 2896
 
 ("The mail- and wire-fraud statutes criminalize the use of the mails or wires in furtherance of any scheme or artifice to defraud ...." (citation and quotation marks omitted));
 
 Badders v. United States
 
 ,
 
 240 U.S. 391
 
 , 393,
 
 36 S.Ct. 367
 
 ,
 
 60 L.Ed. 706
 
 (1916) (Holmes,
 
 J.
 
 ) (rejecting an argument that the use of mail was "a mere incident of a fraudulent scheme that itself is outside the jurisdiction of Congress to deal with," because "[t]he overt act of putting a letter into the postoffice of the United States is a matter that Congress may [and did] regulate").
 

 [20]
 

 In
 
 European Community
 
 ,
 
 764 F.3d 129
 
 , we held in describing the mail and wire fraud statutes that "[i]f domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside the United States."
 
 764 F.3d at 142
 
 . Our holding here does not disturb that rule.
 
 See also
 
 id.
 

 (leaving the "focus" question open "because wherever [the] line [between domestic and extraterritorial applications of the statutes] should be drawn, the conduct alleged here clearly states a domestic cause of action").
 

 [21]
 

 See also
 

 id.
 

 at 142
 
 ("If domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside the United States.").
 

 [22]
 

 See
 
 J.A. 618 (alleging Elsaca "typically authorized the [sham advisory fees] by either wire or mail to UBS employees in New York");
 
 id.
 
 at 620 (alleging that "on a biannual basis, starting in October 2001, Silva mailed invoices to the Capri Star Trust in New York seeking payment of legal fees in the amount of $ 20,000");
 
 id.
 
 (alleging Elsaca authorized the transfers to Silva "by wire or mail to UBS employees in New York").
 

 [23]
 

 The SAC does not allege that the banks knowingly participated in the fraud or were even aware that Elsaca was stealing the Estate's money. In fact, it alleges the opposite-that Elsaca duped UBS into believing these transfers were payments for legitimate services.
 

 [24]
 

 We make no finding with respect to the Sham Management Fees Scheme, as we find this scheme is impermissibly extraterritorial under civil RICO.
 

 [25]
 

 The Court rejected a third possible element, "that the defendant intended to defraud a bank."
 
 Id.
 
 at 356,
 
 134 S.Ct. 2384
 
 .
 

 [26]
 

 We are mindful in reaching this conclusion that this lawsuit has been at the pleading stage since March 17, 2015-for over four years-and has yet to proceed to discovery because of the now-two dismissal orders we have reversed on appeal. We do not, however, preclude Elsaca from raising the "pattern of racketeering activity" argument on a motion for summary judgment or at trial.
 

 [27]
 

 Neither of Elsaca's arguments for affirming dismissal of these claims has any relation to their merits. Nor is either argument persuasive. His argument that the district court correctly dismissed these claims for lack of supplemental jurisdiction after dismissing the federal claims has no force because the federal claims survive. His alternative argument-that Bascuñán abandoned his state-law claims because he "do[es] not mention, let alone challenge" their dismissal for lack of supplemental jurisdiction, Appellee Br. 49-is incorrect.
 
 See
 
 Appellant Br. 53 n.11 ("Reversal of the dismissal of the RICO claims requires reinstatement of the state law claims, over which the District Court declined to exercise supplemental jurisdiction ....").
 

 [28]
 

 However, we do not preclude Elsaca from arguing that these claims are legally insufficient on a motion for summary judgment or at trial.
 
 Cf.
 
 note 26,
 
 supra
 
 .