19-1769(L)
*Sullivan v. UBS AG*

# United States Court of Appeals
# For the Second Circuit

August Term 2023

Argued:   April 30, 2024
Decided:   August 22, 2025

Nos. 19-1769(L), 19-2012(XAP)

STEPHEN SULLIVAN, on behalf of himself and all others similarly situated, WHITE OAK FUND LP, FRONTPOINT PARTNERS TRADING FUND, L.P., FRONTPOINT AUSTRALIAN OPPORTUNITIES TRUST, SONTERRA CAPITAL MASTER FUND, LTD., CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM,

*Plaintiffs-Appellants-Cross-Appellees*,

UBS AG, THE ROYAL BANK OF SCOTLAND PLC, COOPERATIEVE RABOBANK, U.A., ICAP PLC, ICAP EUROPE LIMITED,

*Defendants-Appellees-Cross-Appellants*,

BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., JOHN DOES 1–50, DEUTSCHE BANK, AG, HSBC HOLDINGS PLC, HSBC BANK PLC, CITIGROUP, INC., CITIBANK, N.A., J.P. MORGAN CHASE & CO., J.P. MORGAN CHASE BANK, N.A., BNP PARIBAS (SUISSE) SA, DB GROUP SERVICES (UK) LIMITED, CREDIT AGRICOLE CIB, CREDIT AGRICOLE S.A., SOCIETE GENERALE S.A.,

*Defendants*,

UNITED STATES OF AMERICA,

*Intervenor*.

Appeal from the United States District Court
for the Southern District of New York
No. 13-cv-2811, P. Kevin Castel, *Judge*.

---

Before:   JACOBS, SULLIVAN, and NARDINI, *Circuit Judges*.

Plaintiffs – who include an individual, a retirement fund, and four investment funds that traded in derivatives based on the Euro Interbank Offered Rate ("Euribor") – appeal from a judgment of the United States District Court for the Southern District of New York (Castel, *J.*) dismissing their putative class action claims under the Sherman Act, the Commodity Exchange Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and state common law against an assortment of defendant banks and brokers who allegedly manipulated Euribor to Plaintiffs' detriment.   The district court concluded that it lacked personal jurisdiction over each of the Defendants and dismissed Plaintiffs' claims.

We agree with the district court that Plaintiffs have failed to establish a conspiracy-based theory of personal jurisdiction over the Defendants. Nevertheless, we hold that two of the Plaintiffs – Frontpoint Australian Opportunities Trust ("FPA") and the California State Teachers' Retirement System ("CalSTRS") – established specific personal jurisdiction over two of the defendant banks – UBS AG ("UBS") and The Royal Bank of Scotland PLC ("RBS") – for their Sherman Act and RICO claims arising out of Defendants' over-the-counter Euribor derivative transactions in the United States.   Because we have personal jurisdiction over those defendants as to those causes of action, we must determine whether Plaintiffs' Fourth Amended Complaint stated a claim for relief.   With respect to the RICO claims, we conclude that the predicate acts of wire fraud were sufficiently domestic in nature, but we agree with the district court that Plaintiffs' allegations regarding those predicate acts do not meet the particularity requirement of Federal Rule of Civil Procedure 9(b).   As to the Sherman Act, we hold that Plaintiffs have indeed stated a claim for relief.   Finally, because FPA's and CalSTRS's Sherman Act claims survive, we vacate the district court's refusal to exercise pendent personal jurisdiction over UBS and RBS for the remaining state-law claims.   We therefore **AFFIRM** in part, **REVERSE** in part, and **VACATE** in part the judgment of the district court and **REMAND** for further proceedings consistent with this Opinion.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.

ERIC F. CITRON, Goldstein & Russell, P.C., Bethesda, MD (Vincent Brigant, Geoffrey M. Horn, Margaret C. MacLean, Peter D. St. Philip, Lowey Dannenberg, P.C., White Plains, NY; Patrick T. Egan, Berman Tabacco, Boston MA; Christopher Lovell, Lovell Stewart Halebian Jacobson LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellants-Cross-Appellees*.

PAUL ALESSIO MEZZINA, King & Spalding LLP, Washington, DC (David S. Lesser, King & Spalding LLP, New York, NY, *on the brief*), *for Defendant-Appellee-Cross-Appellant The Royal Bank of Scotland PLC*.

SHARI A. BRANDT (H. Rowan Gaither IV, *on the brief*), Perkins Coie LLP, New York, NY, *for Defendants-Appellees-Cross-Appellants ICAP PLC and ICAP Europe Limited*.

Eric J. Stock, Jefferson E. Bell, Gibson, Dunn & Crutcher LLP, New York, NY, *for Defendant-Appellee-Cross-Appellant UBS AG*.

David R. Gelfand, Tawfiq S. Rangwala, Milbank LLP, New York, NY; Mark D. Villaverde, Milbank LLP, Los Angeles, CA, *for Defendant-Appellee-Cross-Appellant Cooperatieve Rabobank U.A.*

RICHARD J. SULLIVAN, *Circuit Judge*:

Plaintiffs – who include an individual, a retirement fund, and four investment funds[1] that traded in derivatives based on the Euro Interbank Offered Rate ("Euribor") – appeal from a judgment of the United States District Court for the Southern District of New York (Castel, *J.*) dismissing their putative class action claims under the Sherman Act, the Commodity Exchange Act (the "CEA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and state common law against an assortment of defendant banks and brokers who allegedly manipulated Euribor to Plaintiffs' detriment. The district court concluded that it lacked personal jurisdiction over each of the Defendants and dismissed Plaintiffs' claims.

We agree with the district court that Plaintiffs have failed to establish a conspiracy-based theory of personal jurisdiction over the Defendants. Nevertheless, we hold that two of the Plaintiffs – Frontpoint Australian Opportunities Trust ("FPA") and the California State Teachers' Retirement System ("CalSTRS") – established specific personal jurisdiction over two of the defendant

---

[1] Plaintiffs are Stephen Sullivan; White Oak Fund LP; Frontpoint Partners Trading Fund, L.P.; Frontpoint Australian Opportunities Trust; Sonterra Capital Master Fund, Ltd.; and California State Teachers' Retirement System.

banks – UBS AG ("UBS") and The Royal Bank of Scotland PLC ("RBS") – for their Sherman Act and RICO claims arising out of Defendants' over-the-counter ("OTC") Euribor derivative transactions in the United States. Because we have personal jurisdiction over those defendants as to those causes of action, we must determine whether Plaintiffs' Fourth Amended Complaint stated a claim for relief. With respect to the RICO claims, we conclude that the predicate acts of wire fraud were sufficiently domestic in nature, but we agree with the district court that Plaintiffs' allegations regarding those predicate acts do not meet the particularity requirement of Federal Rule of Civil Procedure 9(b). As to the Sherman Act, we hold that Plaintiffs have indeed stated a claim for relief. Finally, because FPA's and CalSTRS's Sherman Act claims survive, we vacate the district court's refusal to exercise pendent personal jurisdiction over UBS and RBS for the remaining state-law claims. We therefore AFFIRM in part, REVERSE in part, and VACATE in part the judgment of the district court and REMAND for further proceedings consistent with this Opinion.

# I.  BACKGROUND

Euribor is "a daily proxy for the average competitive interest rate at which leading banks could borrow Euros from other leading banks."  J. App'x at 643.[2] To calculate Euribor, a select group of contributor banks submit their observations of the terms that prime banks within the European Monetary Union offer one another for Euro deposits.   The participating banks prepare quotes for the interest rates charged on fifteen different maturities, ranging from as short as one week to as long as twelve months, with longer maturities paying a higher interest rate than shorter ones.   The banks then submit these quotes to Thomson Reuters, which discards the highest and lowest fifteen percent of submissions and then averages the middle seventy percent to calculate the official Euribor rate.   Banks that participate in Euribor agree to abide by a code of conduct that, among other things, requires them "to make independent submissions of the competitive rates without

---

[2] The facts here are taken from the Fourth Amended Complaint and are accepted as true for the purposes of this appeal.   *See Vitagliano v. County of Westchester*, 71 F.4th 130, 133 n.3 (2d Cir. 2023). We recognize that Plaintiffs moved before the district court for leave to file a Fifth Amended Complaint, which the district court denied.   However, Plaintiffs do not meaningfully argue on appeal that the district court erred in denying them leave to amend.   Accordingly, they have forfeited any challenge to that ruling, *see Tolbert v. Queen's Coll.*, 242 F.3d 58, 75 (2d Cir. 2001); *Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009), and our review is thus confined to the facts as alleged in the Fourth Amended Complaint.

6

coordination or discussion among the banks," *id.* at 644 (emphasis omitted), and prohibits them from "contributing false Euribor quotes," *id.* at 680.

Euribor plays an important role in setting the value of certain OTC derivatives. At its most basic level, "[a] derivative is simply a contract among two or more parties in which the price or payment term is derived from another source," which here was Euribor. *Id.* at 643. The five categories of OTC derivatives relevant to this appeal are as follows:

- **Chicago Mercantile Exchange ("CME") Euro currency futures contracts ("CME futures").** CME futures are contracts in which one party agrees to trade 125,000 Euros for U.S. dollars on some future date. Because the cost of buying or selling Euros is in the future, the price of the contract is determined by using an industry formula that incorporates Euribor.

- **Foreign-exchange forwards ("FX forwards").** FX forwards are practically identical to CME futures except that the terms of the agreement, such as the amount exchanged and the settlement date, are customizable by the parties. Accordingly, "a change in Euribor will impact the buyer or seller of Euros under [an FX] forward in the same way as a CME . . . futures investor." *Id.* at 686.

- **London International Financial Futures and Options Exchange ("LIFFE") three-month Euribor futures contracts ("LIFFE futures").** LIFFE futures are also similar to CME futures except that they are traded on the LIFFE rather than the CME. In LIFFE futures, the parties agree to settle their positions on a given date, and the transaction's profit or loss is determined by the difference between the initial contract price and the price of an offsetting futures contract that is derived from the three-month Euribor.

- **Forward rate agreements ("FRAs").** FRAs are contracts in which the parties agree to make payments on a settlement date of an amount calculated as the difference between a "forward rate" that is agreed upon in advance and a "market rate" that is based on Euribor. Typically, one party benefits if Euribor increases during the life of the contract while the counterparty benefits if Euribor decreases during that period.

- **Interest-rate swaps.** Interest-rate swaps are contracts in which two parties agree to exchange interest-rate payment obligations on an agreed-upon principal. Taking the simplest example, one party agrees to pay based on a fixed stream of interest-rate payments while the counterparty agrees to pay based on a floating rate, such as one derived from Euribor. When payment is due, the amount owed by each party is netted against the other, and the party with the larger obligation must make a payment reflecting the difference between the two interest rates.

According to the complaint, each of these derivatives depended on Euribor being a competitive rate. However, Plaintiffs allege that from June 1, 2005 until March 31, 2011, Defendants conspired to rig Euribor and fix the prices of OTC Euribor-based derivatives. Specifically, Plaintiffs assert that the banks' Euribor-based derivatives traders requested that the banks manipulate their Euribor submissions, both by targeting specific days when the traders' derivatives positions were going to be priced, benchmarked, and/or settled based on Euribor and by skewing Euribor over the long run to benefit the banks' Euribor-based derivatives positions. According to Plaintiffs, for any given manipulation, four to eight banks coordinated their prices, often through phone calls, at in-person meetings, and while socializing at industry events and conferences. Defendants

8

further manipulated Euribor by borrowing and lending Euros to each other at rates that were either above or below the market, thus distorting the Euribor submissions of other "honest" banks. The defendant banks also colluded with intermediaries, such as interdealer brokers ICAP PLC and ICAP Europe Limited, to transmit false bids and offers to other market participants and therefore manipulate prices by "creating the perception that market prices (and Euribor) were moving in a direction that was beneficial to their trading positions." *Id.* at 722. Finally, Plaintiffs alleged that the management of the defendant banks facilitated this Euribor rigging by "(1) making structural changes to their money markets and interest rate derivatives trading desks to create an environment where benchmark manipulation . . . was encouraged; (2) implementing lax compliance standards that failed to detect any misconduct; and (3) hiding evidence of wrongdoing from government regulators." *Id.* at 750.

Based on this conduct, Plaintiffs commenced a putative class action in the United States District Court for the Southern District of New York. Plaintiffs include one individual, a retirement fund, and four investment funds that traded in Euribor-based derivatives in the United States, although only CalSTRS and FPA alleged that they participated in derivatives transactions with one of the defendant

9

banks as a counterparty. In their Fourth Amended Complaint, Plaintiffs alleged, as relevant here, that Defendants (1) conspired to rig Euribor and restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; (2) manipulated prices for Euribor futures contracts in violation of the CEA, 7 U.S.C. § 1 *et seq.;* and (3) participated in a pattern of racketeering activity based on predicate acts of wire fraud in violation of RICO, 18 U.S.C. § 1961 *et seq.* Plaintiffs also asserted state common-law claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing. In response, Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(6) for failure to state a claim.

The district court concluded that none of the Defendants here had sufficient contacts with the United States to justify the exercise of personal jurisdiction. Alternatively, the district court concluded that Plaintiffs' RICO claims were impermissibly based on extraterritorial conduct and that Plaintiffs' allegations regarding the predicate acts of wire fraud did not meet the particularity requirement of Rule 9(b). In light of these holdings, the district court declined to exercise pendent personal jurisdiction over Defendants for Plaintiffs' state-law claims. Plaintiffs timely appealed, and Defendants timely cross-appealed.

## II.    STANDARD OF REVIEW

We review a district court's dismissal of a complaint for lack of personal jurisdiction *de novo*.   *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).   In doing so, "we construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor."   *Id.* (internal quotation marks omitted).   To survive a motion to dismiss under Rule 12(b)(2), "[p]laintiffs need only make a *prima facie* showing of personal jurisdiction over the defendant[s]."   *Id.* (internal quotation marks omitted).   When, as here, plaintiffs are asserting specific personal jurisdiction, they must make that showing "with respect to each claim asserted."   *Charles Schwab Corp. v. Bank of Am. Corp.* (*Schwab I*), 883 F.3d 68, 83 (2d Cir. 2018) (internal quotation marks omitted).

We also review *de novo* a district court's dismissal for failure to state a claim, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff[s]."   *In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 142 (2d Cir. 2023).   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).   In other words, plaintiffs must "plead[] factual content that

11

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and that establishes "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## III.   DISCUSSION

### A.   Personal Jurisdiction

A federal court may not exercise personal jurisdiction over a foreign defendant unless, among other things, that defendant has "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).   The district court here determined that the relevant forum for the minimum contacts analysis was the United States as a whole, rather than the state of New York, because the federal statutes at issue in this case allow for nationwide service of process.   That determination was consistent with the view espoused by several of our sister Circuits, which have held that "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014) (collecting cases);

12

*see also, e.g.*, *In re Oil Spill by Amoco Cadiz Off Coast of Fr. on Mar. 16, 1978*, 954 F.2d 1279, 1294 (7th Cir. 1992); *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293–97 (3d Cir. 1985). The rationale behind this rule is that "[w]hen the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation." *In re Oil Spill*, 954 F.2d at 1294. We have not yet decided whether this focus on national contacts is correct. *See Gucci Am., Inc.*, 768 F.3d at 142 n.21. But on appeal, neither party meaningfully challenges the district court's decision to look to Defendants' contacts with the United States as a whole, so "neither do we." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* (*Schwab II*), 22 F.4th 103, 122 (2d Cir. 2021).

We have explained that "minimum contacts . . . exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (internal quotation marks omitted). Such "contacts must be created by the defendant *itself*, rather than from the unilateral activity of another party or a third person." *Schwab II*, 22 F.4th at 122 (alterations accepted, citation omitted, and internal quotation marks omitted).

13

Nevertheless, a defendant can purposefully "avail itself of a forum through certain actions taken by a co-conspirator in the forum."  *Id.*

Plaintiffs first argue that we have personal jurisdiction over Defendants under a conspiracy-based theory of jurisdiction.  We disagree.  In order to establish a conspiracy-based theory of jurisdiction, a "plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state," *Schwab I*, 883 F.3d at 87, such that the other conspirators should have "reasonably anticipate[d] being haled into court in the forum as a result of [their co-conspirator's contacts]," *Schwab II*, 22 F.4th at 125 (internal quotation marks omitted).  Plaintiffs focus on two such overt acts, but neither suffices to establish conspiracy jurisdiction.

*First*, Plaintiffs point to their allegation that a manager at Deutsche Bank AG – one of the banks that participated in the Euribor-rigging conspiracy – "held telephone calls each week, where Deutsche Bank's traders, including those located on its New York-based derivatives trading desk, discussed their trading strategy and trading positions, including [the bank's] Euribor submissions and Euribor-based derivatives positions."  J. App'x at 660–61.  However, this single sentence

14

simply describes *intrafirm* communications among derivatives *traders* at a single bank regarding topics directly relevant to their core job responsibility of trading Euribor-based derivatives. It does not allege that any Euribor *submitters* participated in the calls, that any of the traders were aware of a larger conspiracy to manipulate Euribor, or that any participants in the calls influenced Deutsche Bank's Euribor submissions. Accordingly, this sentence does not plausibly allege "[a]n overt act performed by [the New York-based derivatives traders] *for the purpose of* accomplishing the objectives of the conspiracy." *United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011) (emphasis added). And even if these in-house Deutsche Bank calls constituted overt acts, Plaintiffs failed to plausibly allege how the other conspiring banks could have anticipated that these communications would occur in the United States, especially when *all* the other alleged acts of wrongdoing occurred in Europe. *See Schwab II*, 22 F.4th at 125 ("[A] conspiracy theory [of jurisdiction] could not get off the ground if a defendant were altogether blindsided by its co-conspirator's contacts with the forum.").

*Second*, Plaintiffs rely on Deutsche Bank's consent order with the New York State Department of Financial Services, which is attached to the complaint. According to that consent order, "from approximately 2005 through 2010,

15

Deutsche Bank AG and the New York Branch . . . manipulated or attempted to manipulate submissions for the London Interbank Offered Bank ('LIBOR'), the Euro Interbank Offered Rate ('EURIBOR')[,] and Euroyen Tokyo Interbank Offered Rate ('TIBOR')." J. App'x at 1525. We have previously explained that consent orders cannot "be used as evidence in subsequent litigation between that corporation and another party," because they are "not the result of an actual adjudication of any of the issues." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). Although a consent order can be cited at the pleading stage, a plaintiff cannot "*merely* recite[] others' allegations" but rather must "allege non-conclusory facts . . . sufficient to render unproblematic any implied reliance on the [consent order]." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015). Here, the only non-conclusory reference in the consent order to actions taken in New York pertains to LIBOR – *not* Euribor – submissions. Therefore, because Plaintiffs offer no other non-conclusory allegations of overt acts taken in New York, their reliance on the consent order amounts to a mere recitation of another's unadjudicated charge and is insufficient to establish conspiracy jurisdiction.

16

Indeed, the allegations here are a far cry from the facts alleged in cases where we have previously found the existence of conspiracy jurisdiction. For example, in *Schwab II*, the plaintiffs alleged that executives and managers based in the United States "issued [a] standing directive to submit low LIBOR" submissions and "instructed subordinates to submit artificially low . . . LIBOR rates." 22 F.4th at 123 (internal quotation marks omitted). The *Schwab II* plaintiffs also alleged that bank executives and managers based in the United States communicated directly with bank employees responsible for submitting LIBOR bids to manipulate LIBOR rates. The plaintiffs in *Schwab II* quoted an email sent by "a senior JPMorgan Chase executive in New York" asking "the submitter to err on the low side when setting LIBOR," and an email from a "U.S.-based employee of Citibank" urging the submitter to "take a leadership role in bringing these LIBORS back to more sensible levels." *Id.* (alterations accepted and internal quotation marks omitted). Likewise, the *Schwab II* plaintiffs alleged that "a Barclays[] executive who was based in New York . . . admitted that he instructed subordinates to submit artificially low USD LIBOR rates." *Id.* (internal quotation marks omitted). Similarly, the *In re Platinum and Palladium Antitrust Litigation* plaintiffs alleged that substantial "communications occurred in the United States"

and that "such communications were necessary" to carry out the conspiracy. 61 F.4th 242, 271 (2d Cir. 2023). Because no such conspiratorial conduct was alleged to have occurred in the United States here, we hold that Plaintiffs have failed to establish a conspiracy-based theory of jurisdiction.

Nevertheless, Plaintiffs argue that there is still personal jurisdiction with respect to the bank defendants – UBS, RBS, and Cooperatieve Rabobank, U.A. ("Rabobank") – because they engaged in derivatives transactions in the United States. We have held that "[a]llegations of billions of dollars in transactions in [the forum] easily make out a *prima facie* showing of personal jurisdiction for claims relating to those transactions." *Schwab I*, 883 F.3d at 82. Therefore, "to the extent [Plaintiffs'] claims concern transactions in [the United States] . . . , there is jurisdiction over the Defendants who are clearly identified as having" engaged in those transactions. *Id.* at 83.

For starters, plaintiffs Stephen Sullivan, White Oak Fund LP, Frontpoint Partners Trading Fund, L.P., and Sonterra Capital Master Fund, Ltd. have not alleged that they engaged in *any* direct transactions in the United States with a defendant. Thus, they cannot establish personal jurisdiction in this manner, and their claims must be dismissed. In contrast, CalSTRS alleged that it engaged in

18

"hundreds of [FX] forwards with Defendant UBS," J. App'x at 780, and "transacted in Euribor-based interest rate swaps with . . . RBS," *id.* at 784, in the United States. Likewise, FPA alleged that it "entered into two Euro [FX] forward[s] directly with Defendant UBS" in the United States. *Id.* at 788; *see also id.* at 663–64. CalSTRS's and FPA's antitrust claims relate to these transactions because they alleged that the Euribor manipulation caused Euribor-based derivatives to trade at fixed prices instead of the prices that would have been set by competitive market forces. Their RICO claims similarly relate to these transactions because they alleged that the Euribor rigging "caused . . . the prices of Euribor-based derivatives to be manipulated to artificial levels," thus injuring them. *Id.* at 836. "[C]onstru[ing] the pleadings . . . in the light most favorable to [P]laintiffs, [and] resolving all doubts in their favor," *Chloe*, 616 F.3d at 163 (internal quotation marks omitted), we conclude that there is personal jurisdiction over UBS and RBS with respect to CalSTRS's and FPA's Sherman Act and RICO claims.

In addition to these individual claims, Plaintiffs seek to assert claims on behalf of a putative class of individuals who purchased Euribor-based derivatives, so we must address whether we have jurisdiction over these class-action claims as well. In their complaint, Plaintiffs incorporated by reference a Federal Reserve

19

Bank of New York survey, which measures the volume of transactions in foreign-exchange and interest-rate derivatives, such as FX forwards, interest-rate swaps, and FRAs, within the United States. UBS and RBS participated in this survey, thus supporting the plausible inference that they engaged in direct transactions in those derivatives with counterparties in the United States. We therefore conclude that there is personal jurisdiction over claims by members of the putative class who engaged in direct transactions in the United States with UBS and RBS for FX forwards, interest-rate swaps, and FRAs.

Rabobank, on the other hand, is a different story. Plaintiffs did not plausibly allege that Rabobank engaged in Euribor-based derivatives transactions with U.S. counterparties. Granted, Plaintiffs do incorporate by reference a deferred prosecution agreement ("DPA") in which Rabobank admitted that it "entered into interest rate derivatives transactions tied to LIBOR and Euribor" and that "[m]any of [the] counterparties were located in the United States." J. App'x at 1204. But the mere recitation of statements in a DPA, without additional non-conclusory factual allegations, simply does not suffice. *See Loreley*, 797 F.3d at 180 (holding that a plaintiff cannot "*merely* recite[]" admissions in a consent order). What's more, the vague and equivocal language in the DPA does not specify

20

whether Rabobank transacted in Euribor-based derivatives with U.S. counterparties, leaving open the possibility that they solely transacted in LIBOR-based derivatives in the United States.

Likewise, Plaintiffs did not allege that ICAP PLC or ICAP Europe Limited, which are interdealer brokers, engaged in any direct transactions in Euribor-based derivatives with U.S. counterparties. Accordingly, there is no personal jurisdiction over Rabobank, ICAP PLC, or ICAP Europe Limited, and the claims against those defendants must be dismissed.

Finally, we address whether there is personal jurisdiction over potential claims related to LIFFE futures and CME futures. With respect to the former, those derivatives were traded entirely on a foreign exchange located in London, so any transactions involving them cannot confer specific personal jurisdiction. And with respect to the latter, there are no allegations in the complaint that any defendant traded Euribor-based derivatives on the CME. Therefore, we have no jurisdiction over any defendant to hear claims related to LIFFE or CME futures. Because Plaintiffs' CEA claims only pertain to CME futures and LIFFE futures, those causes of action must be dismissed in their entirety.

To sum up, we conclude that there is personal jurisdiction only over UBS and RBS for the Sherman Act and RICO claims asserted by CalSTRS, FPA, and members of the putative class who engaged in direct transactions in FX forwards, interest-rate swaps, and FRAs with those banks in the United States. All other claims by all other plaintiffs against all other defendants are dismissed for lack of personal jurisdiction.

## B. RICO Claims

In addition to holding that it lacked personal jurisdiction over Defendants, the district court concluded, in the alternative, that the complaint failed to state a claim. With respect to Plaintiffs' RICO claims, the district court determined that the complaint failed to allege sufficient domestic conduct. Our caselaw is clear that RICO does not apply extraterritorially for private claims predicated on violations of the wire-fraud statute. *See Bascuñán v. Elsaca*, 927 F.3d 108, 121 (2d Cir. 2019). Thus, Plaintiffs can rely on the wire-fraud statute "only if [it] appl[ies] to domestic conduct on these facts." *Id.* We have explained that "a claim predicated on . . . wire fraud involves sufficient domestic conduct when (1) the defendant used domestic . . . wires in furtherance of a scheme to defraud, and (2)

22

the use of . . . wires was a core component of the scheme to defraud."  *Id.* at 122. That standard is satisfied here.

Plaintiffs' RICO claims are predicated on Defendants' manipulation of Euribor, which was intended to "increas[e] [their] profits from trading in derivatives priced, benchmarked[,] and/or settled based on Euribor."  J. App'x at 830.  Plaintiffs further alleged that UBS and RBS transacted in rigged Euribor-based derivatives with U.S. counterparties, which required them to send trade confirmations using U.S. wires.  Because those derivative transactions in the United States enabled UBS and RBS to profit from their alleged Euribor manipulation, we determine that such use of domestic wires was "essential, rather than merely incidental, to the scheme to defraud."  *Bascuñán*, 927 F.3d at 122.

Nevertheless, the district court also concluded that Plaintiffs' allegations regarding the predicate acts of wire fraud failed to meet the particularity requirement of Rule 9(b).  We have long held that RICO claims premised on predicate acts that sound in fraud, including wire fraud, must satisfy the heightened pleading standards of Rule 9(b).  *See First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004).  As a result, "[a]llegations of predicate . . . wire fraud acts should state the contents of the communications, who

23

was involved, [and] where and when they took place, and [should] explain why they were fraudulent." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (internal quotation marks omitted).

We agree with the district court that Plaintiffs rely on conclusory general allegations that fall far short of this standard. *See* J. App'x at 829 ("Plaintiffs identify hundreds of predicate acts of wire fraud."). While it is true that Plaintiffs include some specific communications that suggest UBS and RBS concocted false Euribor submissions at various times during the class period, Plaintiffs do not even attempt to tie any of these fraudulent communications to a specific U.S.-based derivative transaction involving CalSTRS and FPA. Indeed, the only identified false Euribor submission from RBS occurred on October 4, 2007, which was six months before CalSTRS transacted in interest-rate swaps with RBS in April 2008. Likewise, the false Euribor submissions from UBS in October 2006, August 2007, and June 2009 were long before CalSTRS and FPA transacted in FX forwards with UBS in June 2010 and February 2011, respectively. In essence, Plaintiffs ask us to simply presume that *every* one of UBS's and RBS's daily Euribor submissions was false, but Rule 9(b) requires more than mere assumptions. And while Plaintiffs do not need to link every transaction to a fraudulent statement, they do

need to allege at least two predicate acts of wire fraud "as to each individual defendant" with particularity, which they plainly have not done. *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001). Instead, the Fourth Amended Complaint leaves us – and Defendants – guessing as to the details of the allegedly fraudulent statements. Accordingly, we affirm the district court's dismissal of Plaintiffs' RICO claims for failure to comply with Rule 9(b).

## C.  Sherman Act Claims

As part of their cross-appeal, Defendants also argue that Plaintiffs have failed to state a claim under the Sherman Act because they (1) failed to allege the existence of a Sherman Act conspiracy, (2) failed to allege an antitrust injury related to transactions in FX forwards, and (3) are not efficient enforcers for antitrust claims based on FX forwards. We address each of these arguments in turn.

Defendants first contend that Plaintiffs failed to plausibly allege the existence of a Sherman Act conspiracy. As the Supreme Court has explained, any conspiracy "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150,

223 (1940). To survive a motion to dismiss, a plaintiff alleging a Sherman Act violation predicated on a price-fixing conspiracy must "allege enough facts to support the inference that a conspiracy actually existed." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). A plaintiff may rely on "direct evidence that the defendants entered into an agreement in violation of the antitrust laws" or, more commonly, on "circumstantial facts supporting the inference that a conspiracy existed." *Id.* (emphasis omitted). If a plaintiff takes the latter approach, those "[c]ircumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (internal quotation marks omitted).

Taking the allegations in the complaint as true and drawing all reasonable inferences in favor of Plaintiffs, we conclude that they have adequately pleaded the existence of a Sherman Act conspiracy involving RBS and UBS. Specifically, the complaint alleged that Philippe Moryoussef – a trader at Barclays – was a key participant in the conspiracy to manipulate Euribor. After he moved to RBS in August 2007, Moryoussef "continued to participate in the agreement to rig Euribor and fix the prices of Euribor-based derivatives by conspiring with his former

26

junior traders who were still at Barclays." J. App'x at 665–66. Indeed, the complaint reproduces chat messages where Moryoussef coordinated Euribor submissions with his former Barclays colleagues. And in one such message from November 2007, Moryoussef stated that "rbs and ubs are going to do everything to put [Euribor] to the . . . sk[y]," leading to the plausible inference that RBS and UBS were conspiring to rig Euribor prices. *Id.* at 2533.

The complaint also included a variety of other allegations related to UBS's involvement in the conspiracy. For example, in November 2007, a Euribor submitter at Société Générale sent chat messages wherein he "explained how he anticipated UBS'[s] requests when he prepared his Euribor submissions," supporting an inference that "collusive communications between UBS and Société Générale not only occurred, but occurred with enough frequency that [the submitter] could anticipate UBS'[s] needs." *Id.* at 2534. Likewise, the complaint contained an "angry email" that Moryoussef sent in October 2006 "because UBS did not help him with Euribor submissions" that month. *Id.* In that email, Moryoussef "identif[ied] UBS as one of his 'friends' who 'had not been there' to make the agreed upon false Euribor submission," suggesting that Moryoussef had conspired with individuals at UBS in the past. *Id.*

27

Based on these and other non-conclusory allegations, we hold that Plaintiffs have sufficiently pleaded RBS's and UBS's involvement in a conspiracy to manipulate Euribor in violation of the Sherman Act.

Defendants next argue that Plaintiffs have not adequately alleged an antitrust injury related to transactions in FX forwards. A plaintiff must establish "antitrust injury, which is to say injury of the type [that] the antitrust laws were intended to prevent and that flows from" the defendants' unlawful acts. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). We have explained that "[g]enerally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer" an antitrust injury. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016); *see also State of New York v. Hendrickson Bros.*, 840 F.2d 1065, 1079 (2d Cir. 1988) ("In general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury.").

We conclude that Plaintiffs here have sufficiently pleaded antitrust injuries. CalSTRS alleged that during the month of June 2010 – when it entered into an FX forward with UBS – Defendants "were engaged in an upward manipulation of

28

Euribor," which "artificially increased the amount of Euro required for CalSTRS to fulfill its obligations to . . . UBS" under the FX forward, thus injuring CalSTRS. J. App'x at 781. Likewise, FPA alleged that as a result of the Euribor manipulation, FPA "paid more for and/or received less Euros" under the FX forwards it entered into with UBS in February 2011. *Id.* at 788.

In response, Defendants argue that Plaintiffs have not sufficiently pleaded how the Euribor manipulation affected the pricing of FX forwards, since those contracts do not directly incorporate Euribor as a term. But Plaintiffs alleged that FX forwards are priced using an industry-standard formula that incorporates Euribor. Therefore, this case is a far cry from *Harry v. Total Gas & Power North America, Inc.*, where the plaintiffs merely alleged that "shockwaves from [d]efendants' market manipulation . . . reverberated through" the market and thus generated higher prices. 889 F.3d 104, 109 (2d Cir. 2018). In contrast, CalSTRS and FPA have explained the specific "mechanism" by which Defendants' manipulation "affect[ed] [them] more than marginally." *Id.* at 113. And while Defendants contend that the industry formula for FX forwards does *not* incorporate Euribor, that "is a disputed factual issue that must be reserved for the

29

proof stage" and cannot be resolved on a motion to dismiss. *Gelboim*, 823 F.3d at 776.

Defendants also assert that CalSTRS and FPA are not efficient enforcers for antitrust claims based on FX forwards. We have long recognized that "even where a plaintiff has cleared the antitrust-injury hurdle, the plaintiff must further show that it is an efficient enforcer of the antitrust laws." *Schwab II*, 22 F.4th at 115 (internal quotation marks omitted). This is because "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983) (internal quotation marks omitted).

In determining whether a plaintiff is an efficient enforcer, we consider four factors: (1) "the directness or indirectness of the asserted injury"; (2) "the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) "the extent to which the claim is highly speculative"; and (4) "the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *In*

*re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021) (internal quotation marks omitted).

Defendants here focus on the first factor and argue that CalSTRS's and FPA's asserted injuries are not sufficiently direct.[3] It is true that "[f]or the purposes of antitrust standing, proximate cause is determined according to the so-called 'first-step rule,'" whereby only "injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior." *Schwab II*, 22 F.4th at 116 (internal quotation marks omitted). But we have clarified that "[t]he first-step rule and traditional proximate cause considerations require drawing a line between those whose injuries resulted from their direct transactions with the [defendants] and those whose injuries stemmed from their deals with third parties." *Id.* The former suffices while the latter does not.

Here, CalSTRS's and FPA's surviving allegations all pertain to their direct transactions with UBS and RBS, which are alleged to have financially benefitted from those transactions because the relevant derivatives were priced using a

---

[3] Defendants also argue that Plaintiffs have not adequately alleged how Euribor affects the price of FX forwards, but we have already rejected that argument above and need not address it again. *See supra* pp. 29–30.

formula that incorporated the manipulated Euribor rate.   Accordingly, this is not

a case where "the decision of a third party to incorporate [Euribor] as a term in a

financial instrument could be made without any connection to the actions of the

[b]anks" or where the banks "had no financial stake in the transactions

whatsoever."  *Id.*  We therefore agree with the district court that CalSTRS and

FPA satisfy the first efficient-enforcer factor.

### D.    Class Standing

Defendants further argue that because CalSTRS and FPA never transacted

in FRAs, they lack standing to assert causes of action on behalf of holders of those

derivatives.   We disagree.

We have previously explained that "in a putative class action, a plaintiff has

class standing if he plausibly alleges (1) that he personally has suffered some actual

. . . injury as a result of the putatively illegal conduct of the defendant," and "(2)

that such conduct implicates the same set of concerns as the conduct alleged to

have caused injury to other members of the putative class by the same

defendants."   *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d

145, 162 (2d Cir. 2012) (internal quotation marks omitted).   Only the second prong

is at issue here, and under our caselaw, that prong is satisfied when "the named

plaintiff ha[s] the right incentives" because "the proof contemplated for all of the claims would be sufficiently similar," such as when proving the defendant's misconduct as to certain claims "would tend to prove" its misconduct as to the other claims. *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 161–62 (2d Cir. 2014).

We agree with the district court that "any harm suffered by a party to an FRA as a result of . . . Euribor's manipulation would have been caused by the identical misconduct of the identical parties." *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *8 (S.D.N.Y. Feb. 21, 2017). Thus, "[l]iability would turn on the same proof as to the allegedly false Euribor submissions," namely the dates, direction, and magnitude of Defendants' Euribor manipulations. *Id.* And even though CalSTRS and FPA may have suffered injuries distinct from those suffered by FRA holders, we have made clear that "non-identical injuries of the same general character can [still] support standing." *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 94 (2d Cir. 2018). We therefore conclude that CalSTRS and FPA have class standing to assert claims on behalf of FRA holders.

### E. State-Law Claims

Finally, the district court held that there was no basis to exercise pendent personal jurisdiction over Defendants for Plaintiffs' state-law claims because Plaintiffs had not made out a *prima facie* case of personal jurisdiction with respect to any of the defendants here on any claims. We have explained that "under the doctrine of pendent personal jurisdiction, where," as here, "a federal statute authorizes nationwide service of process and the federal and state claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties [for] the related state law claims even if personal jurisdiction is not otherwise available." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993) (citation and internal quotation marks omitted). In light of our determination that there is personal jurisdiction over UBS and RBS and that the Fourth Amended Complaint sufficiently pleaded Sherman Act claims as to those defendants by FPA and CalSTRS, we vacate the district court's dismissal of the state-law claims. Of course, "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right," and depends on "considerations of judicial economy, convenience[,] and fairness to litigants." *Id.* at 1059 (internal quotation marks omitted). Therefore, while it is hard to imagine why the district court

34

would decline to exercise pendent personal jurisdiction over UBS and RBS as to state-law claims that stem from the same alleged misconduct as the Sherman Act claims, we leave that determination to the district court in the first instance and thus remand for further proceedings consistent with this Opinion. *See Schwab I*, 883 F.3d at 88.

Defendants argue in the alternative that Plaintiffs' state-law claims are time-barred because they were not filed within the relevant statutes of limitations. Generally, "a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998) (internal quotation marks omitted). Defendants concede here that Plaintiffs could not have been on such notice before October 19, 2011 – the date "when the European Commission raided the offices of banks on the Euribor panel for suspected rate manipulation, which was publicly announced and reported on the same day." Bank Defs. Br. at 68. Using that date as our starting point, we conclude that Plaintiffs' state-law claims were all filed within the relevant statutes of limitations.

## IV.   CONCLUSION

For all the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **VACATE** in part the judgment of the district court and **REMAND** for further proceedings consistent with this Opinion.